1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAMES EMANUEL DUDLEY III,

                Plaintiff,

    v.

LEE ALAN PRITCHARD,

                Defendant.

CASE NO. 3:22-cv-05437-RSM-BAT

**REPORT AND RECOMMENDATION**

Plaintiff James Emanuel Dudley, III, a prisoner currently confined at Coyote Ridge Corrections Center, filed a *pro se* 42 U.S.C. § 1983 civil rights action alleging Defendant Lee Alan Pritchard, a Pierce County Sheriff's Deputy, used excessive force during Plaintiff's arrest and transport. *See* Dkt. 3 and Dkt. 32 at 3.

On March 14, 2023, Defendant filed a motion for summary judgment. Dkt. 37. Defendant also filed a declaration in support (Dkt. 38) and an exhibit containing the police body-worn camera footage of the incident (*see* Dkt. 39). Plaintiff requested and the Court granted an extension to respond, and renoted the motion for summary judgment for May 5, 2022. Dkt. 41. On April 6, 2023, Plaintiff filed a response opposing the summary judgment motion, Dkt. 42, and an accompanying declaration, Dkt. 43, and on May 5, 2023, Defendant filed a reply. Dkt. 45.

REPORT AND RECOMMENDATION - 1

1      For the reasons below, the Court recommends Defendant's motion for summary

2  judgment, Dkt. 37, be **GRANTED** and this case be **DISMISSED** with prejudice.

3                                    **BACKGROUND**

4      The parties do not dispute the general background facts of this case. There is no dispute

5  that on January 1, 2022, Defendant arrested Plaintiff, handcuffed him, and placed him into the

6  rear seat of a police vehicle without incident. Dkts. 32 at 4; 38 at 2. While Defendant was

7  transporting Plaintiff to the Pierce County Jail, Plaintiff began to complain his hands were

8  becoming numb because of the handcuffs. Dkts. 32 at 4; 38 at 2. There is no dispute that after

9  Plaintiff made this complaint, Defendant pulled over to the side of the road to examine and

10  adjust the handcuffs on Plaintiff. However, the parties disagree regarding the timing and

11  circumstances of Defendant's actions following Plaintiff's complaints the handcuffs were too

12  tight.

13      *A.      Plaintiff's Allegations*

14      Plaintiff's operative complaint alleges Defendant ignored his complaints of numbness in

15  his hands and requests to loosen the handcuffs for 15 to 20 minutes and that he passed several

16  well-lit areas before pulling over "in the dark, next to the Puyallup River." Dkt. 32 at 4. Plaintiff

17  alleges he asked Defendant, "Why are you pulling over in the dark?" *Id.* Plaintiff claims

18  Defendant opened the car door and instructed Plaintiff to get out of the car while he was still

19  buckled in his seat. *Id.* When Defendant unbuckled Plaintiff's seat belt, Plaintiff alleges he fell

20  forward and the seat belt strap landed on his neck, at which point he screamed, "I can't breathe."

21  *Id.* After Plaintiff got out of the patrol car, he claims he was "slung to the ground." *Id.* at 5.

22  Plaintiff alleges "[w]hen [he] was finally let up, he yelled for a passing pedestrian to help so

23  Plaintiff could draw attention to the situation transpiring." *Id.* Although Plaintiff initially claimed

REPORT AND RECOMMENDATION - 2

he was put back in the patrol car with no handcuff adjustment, he concedes in his declaration opposing summary judgment "the officers double cuffed the Plaintiff after 20 minutes of requesting them to be loosened." Dkt. 43 at 1. Plaintiff states Defendant then drove an additional 20 minutes to the jail. Dkt. 32 at 5.

Plaintiff claims the handcuffs were "overtight," causing "excruciating pain and loss of feeling in the Plaintiff's hands." Dkt. 43 at 1. He contends, due to his size, "not being double cuffed from the beginning caused extreme pain in his wrists and shoulders." *Id.* He claims although he complained multiple times the handcuffs were too tight and his hands were going numb, Defendant did not attempt to adjust the handcuffs for 20 or more minutes. *Id.* Plaintiff claims the pain and numbness in his hands persisted after the incident and he was treated by Pierce County Jail medical staff with pain medication for four months. *Id.* at 1-2. Plaintiff states he "has attempted to retain his medical records to no avail." *Id.* at 2.

### B.    *Defendant's Summary Judgment Declaration*

Defendant filed a declaration in support of summary judgment that he arrested Plaintiff after he and two other deputies responded to an "unwanted person call" at a residence near Lake Tapps. Dkt. 38 at 1. Defendant states he was familiar with the location because deputies had responded to a domestic violence call at the same address two days before, which had resulted in Plaintiff's arrest for second degree assault and felony harassment with a domestic violence designation. *Id.* at 1-2. Defendant placed Plaintiff in handcuffs, which he claims were gauged, double locked, and check for proper fit, in accordance with his training. *Id.* at 2.

After Plaintiff began complaining the cuffs were too tight, Defendant states he "pulled over at the next safe location [he] could find," which he recalls as "a well-lighted location with a broad shoulder that provided room to safely adjust the handcuffs." *Id.* Defendant claims Plaintiff

refused to cooperate as he was trying to adjust the handcuffs, so he had to request backup. *Id.*
Defendant states Officer Kaleb Johnson of the Puyallup Police Department arrived, persuaded
Plaintiff to get out of the car, and applied a second set of handcuffs interlinked with the first pair.
*Id.* at 3. Defendant avers Officer Johnson checked to ensure he could fit his finger to the first
knuckle in each cuff around Plaintiff's wrists, consistent with the training on proper use and fit
of handcuffs. *Id.* While Officer Johnson was adjusting the handcuffs, Defendant states Plaintiff
continued to yell he was in pain, although Defendant could not see any "obvious cause for the
pain." *Id.*

Defendant claims Plaintiff then began moving away from the passenger door, and he and
Officer Johnson had to push Plaintiff to keep him out of the roadway, taking him down to his
knees. *Id.* He states Plaintiff's pants fell down in the process. *Id.* Defendant contends he and
Officer Johnson were unable to get Plaintiff back into the patrol car until additional Puyallup
Police officers arrived, although Plaintiff "continued to resist by spreading his feet to prevent
being moved." *Id.* Defendant states these events were recorded on his body camera, dash camera,
and back seat cameras. *Id.*

### C.    *Police Camera Footage of Incident*

Defendant submitted police camera footage as an exhibit in support of his motion for
summary judgment. *See* Dkt. 39. The timestamp on the police camera recording shows Plaintiff
was handcuffed at approximately 16:58:58. Plaintiff was directed into the back seat of
Defendant's patrol car around 17:24:35. Plaintiff can first be heard complaining of numbness in
his hands at 17:44:06. At 17:44:21, Defendant asked if Plaintiff could lean forward to relieve the
pressure on his hands and then stated, "I'll pull over in just a second." Plaintiff continued

complaining his hands were going numb, and Defendant stated he was looking for a safe place to pull over.

Defendant's police vehicle stopped at approximately 17:45:50. Defendant walked around the car and opened the rear passenger-side door, where Plaintiff was sitting. Defendant instructed Plaintiff to turn and face away from him so that he could adjust the handcuffs, which were behind Plaintiff's back. Plaintiff responded he was not able to turn because his seat belt was buckled. Defendant responded that he would have to wait for a second unit and used his radio to request backup. Plaintiff continued to complain that his hands were going numb. Defendant unbuckled Plaintiff's seatbelt at approximately 17:47:14 and instructed Plaintiff to turn and face away from him so that he could adjust the handcuffs. Plaintiff continued to yell that his hands were numb and ask for help but stated that he was not able to turn in his seat because he was handcuffed. He asked Defendant for help turning, and when Defendant pushed on his knees, Plaintiff yelled in pain. At approximately 17:48:18, Defendant stated, "You're playing a game at this point," and closed the car door. Defendant returned to the driver's seat of the car and requested on his radio that backup be "expedited" because Plaintiff was complaining of his hands going numb.

An additional patrol car arrived around 17:52:56. Defendant opened the rear passenger door and instructed Plaintiff to step out of the car so he could adjust the handcuffs. Plaintiff continued to protest he could not move. He stepped out of the car at approximately 17:55:47. At 17:56:25, the second officer, who introduced himself to Plaintiff as Officer Johnson from Puyallup Police Department, removed the handcuff from Plaintiff's left wrist while Defendant held Plaintiff's right arm, attached a second set of handcuffs to Plaintiff's left wrist, and linked the two sets of handcuffs together. Plaintiff continued complaining his hands were numb and that

the cuffs were too tight on his wrists. Officer Johnson stated he was loosening the cuff on Plaintiff's right wrist. At approximately 17:58:00, the video shows Defendant fitting his gloved index finger between the cuff and Plaintiff's right wrist while Plaintiff yells that the cuff is too tight.

The police video shows Defendant instructing Plaintiff to get back in the car, but Plaintiff continued yelling for help and began moving toward the back of the vehicle. Around 17:58:52, Plaintiff yelled, "Why are my pants down?" and began struggling around the back of the car. He yelled he wanted to be on the side of the car near the street. At approximately 17:59:38, Defendant and Officer Johnson pushed Plaintiff to his knees on the driver's side of the car. Plaintiff continued yelling for help and stated he wanted more officers present. Another officer appeared on the recording around 18:03:07 and stated that his name was Sergeant Cruz. He informed Plaintiff that he needed to get back in the car. Plaintiff stated again the cuffs were too tight around 18:03:17. Defendant informed Plaintiff that they were going to stand him up, get his pants pulled back up, and walk him over to the passenger side of the car. Plaintiff stated the circulation was being cut off in his hands. The officers pulled Plaintiff to his feet and eventually walked Plaintiff around the front of the car and into the rear passenger door.

Defendant buckled Plaintiff's seat belt and began driving again around 18:08:33. Plaintiff stated that his hands were still numb. Defendant responded that he had tried to help him but because of the difficulties, he "[did not] think [they would] be stopping" before they got to the jail. At 18:20:55, Defendant parked at the jail and got out of the car. Defendant described Plaintiff to jail staff as a "big guy, 6'5", 240-ish." Corrections officers assisted Plaintiff out of the car around 18:22:44. The recording ends as Plaintiff is being escorted into the elevator by jail staff at 18:24:25.

REPORT AND RECOMMENDATION - 6

1

## LEGAL STANDARDS

2          The Court shall grant summary judgment if the movant shows there is no genuine dispute

3    as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.

4    56(a). The moving party has the initial burden of production to demonstrate the absence of any

5    genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). A

6    genuine dispute concerning a material fact exists when there is sufficient evidence for a

7    reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*,

8    477 U.S. 242, 248, 253 (1986). A "material" fact is one which is "relevant to an element of a

9    claim or defense and whose existence might affect the outcome of the suit," and the materiality

10   of which is "determined by the substantive law governing the claim." *T.W. Elec. Serv., Inc. v.*

11   *Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). When the Court considers a

12   motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all

13   justifiable inferences are to be drawn in [their] favor." *Anderson*, 477 U.S. at 255. However,

14   when the record before the Court on summary judgment includes relevant body camera footage,

15   "a district court may properly view the facts in the light depicted by bodycam footage and its

16   accompanying audio, to the extent the footage and audio *blatantly* contradict testimonial

17   evidence." *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022).

18          "If the moving party shows the absence of a genuine issue of material fact, the non-

19   moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine

20   issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (quoting *Celotex*

21   *Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). The non-moving party may not rely upon mere

22   allegations or denials in the pleadings but must set forth specific facts showing that there exists a

23   genuine issue for trial. *Anderson*, 477 U.S. at 249. The nonmoving party is required to present

specific facts and cannot rely on conclusory allegations. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993). A plaintiff "must produce at least some significant probative evidence tending to support" the allegations in the complaint. *T.W. Elec. Serv., 809 F.2d at 630* (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).  The Court must determine whether the specific facts that are presented by the non-moving party, considered along with undisputed context and background facts, would show that a rational or reasonable jury might return a verdict in the non-moving party's favor based on that evidence. *Emeldi v. Univ. of Or.*, 698 F.3d 715, 728-29 (9th Cir. 2012).

To prevail on a 42 U.S.C. § 1983 claim, a plaintiff must establish that (1) he suffered a violation of a right protected by the Constitution, and (2) the violation was proximately caused by a person acting under color of state law. *Crumpton v. Gates*, 847 F.2d 1418, 1420 (9th Cir. 1991). Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

## DISCUSSION

Plaintiff claims Defendant's use of "overtight cuffs" during his post-arrest transport and failure to respond to Plaintiff's complaints of pain in a timely manner constituted excessive use of force in violation of the Fourth Amendment. Dkts. 32 at 3-5; 42 at 3.

In addressing a § 1983 excessive force claim, the Court's "analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham*, 490 U.S. at 394. The protection against unreasonable seizures found in the Fourth Amendment governs both the lawfulness of a seizure itself and of the means used to accomplish it. *Id.* at 394-95; *see also Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). "The Fourth

Amendment's 'objective reasonableness' standard 'governs a free citizen's claim that law enforcement officials used excessive force,' in any search or seizure, while the Fourteenth Amendment's objective reasonableness standard protects pretrial detainees." *Hughes*, 31 F.4th at 1220 (quoting *Graham*, 490 U.S. at 388) (internal citation omitted). Courts analyzing an excessive force claim under either the Fourth or Fourteenth Amendment "must determine whether the force was objectively unreasonable in light of the 'facts and circumstances of each particular case.'" *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 n.2 (2021) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

"It is well-established that overly tight handcuffing can constitute excessive force." *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004). Factors that may bear on the reasonableness of the force used include, among others, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. 389, 397 (2015). The objective reasonableness of an officer's use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97.

Here, the police body camera footage establishes Plaintiff was arrested and handcuffed for about 25 minutes before being placed in Defendant's patrol car. Plaintiff then sat for about 20 additional minutes in the police vehicle before indicating to Defendant the handcuffs were too tight. In response, Defendant pulled over less than two minutes after Plaintiff first complained his hands were going numb. Defendant attempted to help Plaintiff turn in his seat to expose his

hands when Plaintiff claimed he could not do so himself. Even with the delay, the handcuffs were adjusted within 15 minutes of Plaintiff's initial complaint.

There is no dispute that the incident supporting Plaintiff's complaint was recorded by the police camera that Defendant wore. This recording, even when taken in the light most favorable to Plaintiff, demonstrates there can be no dispute that Defendant's actions and use of force were objectively reasonable under the circumstances of the case. First, there is no dispute that when Defendant arrested Plaintiff, Defendant did not use unreasonable force in handcuffing Plaintiff. The arrest occurred without incident and Plaintiff made no complaints that the handcuffs were too tight, during the 25 minutes that he stood outside of the police car upon arrest.

Second, the police video establishes Plaintiff sat in the police vehicle Defendant was driving for approximately 20 minutes before he first complained that the handcuffs were too tight. There is no evidence Defendant ignored Plaintiff's complaint; instead the police video records Defendant's suggestion Plaintiff lean forward to relieve pressure on his hands and statement that he would pull over in a second.

Third, the police video establishes Defendant did pull over in less than two minutes from the time Plaintiff first complained the handcuffs were too tight. The video establishes Defendant pulled over at a location with a wide shoulder and across the street from a brightly lighted commercial area. The video thus establishes Defendant reasonably responded to Plaintiff's complaints.

Fourth, after pulling over, the police video establishes Defendant attempted to adjust the handcuffs but after three minutes, called for police backup when Plaintiff would not turn and position his body so that Defendant could adjust the handcuffs. The video shows Defendant reasonably attempted to adjust the handcuffs but was thwarted by Plaintiff's conduct.

REPORT AND RECOMMENDATION - 10

Fifth, an additional patrol car arrived approximately four minutes after Defendant called for backup. Defendant then asked Plaintiff to step out of the vehicle and Plaintiff eventually did after a minute or so. The additional officer, Officer Johnson adjusted Plaintiff's handcuffs. The police video shows law enforcement fitting a gloved index finger between the cuff and Plaintiff's right wrist while Plaintiff yells the cuff is too tight. The police video thus establishes that Defendant, with the help of Officer Johnson, adjusted Plaintiff's handcuffs and the space between the cuffs and Plaintiff's wrists was sufficient and not so tight as to violate the Fourth Amendment.

Sixth, the police video shows that after the handcuffs were adjusted, Plaintiff was instructed to get back in the car. However, Plaintiff continued yelling for help, began moving toward the back of the vehicle, began struggling around the back of the car and yelled he wanted to be on the side of the car near the street. In response, Defendant and Officer Johnson pushed Plaintiff to his knees on the driver's side of the car. As Plaintiff was pushed down, the back of his pants began to fall down. The police video shows Defendant reasonably responded to Plaintiff's actions to not get into the police car's back seat and Plaintiff's attempt to move toward the street.

And seventh, after Defendant and Officer Johnson were able to get Plaintiff back into the police vehicle, it took about 12 minutes for Defendant to drive Plaintiff to the Jail. While Plaintiff continued to complain about the handcuffs, it was not unreasonable for Defendant to indicate that he was not going to stop again given what had just happened during the first stop to adjust the handcuffs.

In sum, there is no evidence Defendant violated Plaintiff's rights by placing the handcuffs on too tightly when he first arrested Plaintiff. To the contrary, the video evidence establishes

REPORT AND RECOMMENDATION - 11

Plaintiff stood with the cuffs on for 25 minutes without complaint. The video evidence further establishes Plaintiff sat for another 20 minutes in the police car without complaint. When Plaintiff eventually complained about the handcuffs, Defendant quickly suggested a way to relieve any pressure, and also stopped the police car within minutes. Defendant then tried to adjust the handcuffs but due to Plaintiff's lack of cooperation had to call for backup. Backup arrived within a few minutes, and the police video shows the handcuffs were adjusted with sufficient space between cuff and wrist.  Plaintiff alleges Defendant pulled his pants down but the video shows no intentional act by Defendant. Rather, Plaintiff's pants dropped down as he was struggling and was being taken to the ground. The police video thus contradicts Plaintiff's claim that Defendant ignored his multiple complaints of pain and that "20 or more minutes went by until any attempt to adjust [the] overtight cuffs ever happened." Additionally, Plaintiff has not submitted any evidence of injury other than his own self-serving allegations.

Because the police video shows Defendant did not act in an objectively unreasonable manner throughout his contact with Plaintiff and thus did not violate Plaintiff's constitutional rights, the Court recommends **GRANTING** Defendant's motion for summary judgment, Dkt. 37, and **DISMISSING** the case with prejudice.[1]

## OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore, Plaintiff should not file a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit until the assigned District Judge enters a judgment in the case.

---

[1] Because the Court concludes Defendant did not violate Plaintiff's constitutional rights, the Court need not address whether Defendant is shielded by the doctrine of qualified immunity.

Objections, however, may be filed and served upon all parties no later than **May 22, 2023.** The Clerk should note the matter for **May 26, 2023**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed 10 pages. The failure to timely object may affect the right to appeal.

DATED this 8th day of May, 2023.

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATION - 13